# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DAVID KEITH MEYERS,<br><br>Plaintiff,<br><br>v.<br><br>NANCY A. BERRYHILL, Acting Commissioner of Social Security,[1]<br><br>Defendant. | 1:16-cv-430-GSA<br><br>**ORDER DIRECTING ENTRY OF JUDGMENT IN FAVOR OF PLAINTIFF DAVID KEITH MEYERS AND AGAINST DEFENDANT NANCY A. BERRYHILL** |

**I.   INTRODUCTION**

Plaintiff David Keith Meyers ("Plaintiff") seeks judicial review of a final decision by the Commissioner of Social Security ("Commissioner" or "Defendant") denying his application for disability insurance benefits ("DIB") and supplemental security income ("SSI") benefits pursuant to Titles II and XVI of the Social Security Act. (Doc. 1, 13). The Commissioner filed an opposition . (Doc.18). Plaintiff filed a reply. (Doc. 21).  The matter is currently before the Court on the parties' briefs which were submitted without oral argument to the Honorable Gary S.

---

[1] Pursuant to Fed. R. Civ. Pro. 25(d), Nancy A. Berryhill shall be substituted in for Carolyn W. Colvin, as Nancy A. Berryhill is now the acting Commissioner of Social Security.

1

Austin, United States Magistrate Judge. [2] After reviewing the administrative record and the pleadings, the Court finds the ALJ's decision is not supported by substantial evidence and grants Plaintiff's appeal. The case is remanded for further proceedings pursuant to sentence four of 42 U.S.C. § 405(g).

## II.   BACKGROUND AND PRIOR PROCEEDINGS[3]

The parties agree that the Plaintiff properly exhausted his administrative remedies and that the Appeals Council denied Plaintiff's appeal. (Doc. 13, pgs. 1-2; Doc. 18, pg. 1).  Therefore, this appeal is a review of Administrative Law Judge Catherine Lazuran ("ALJ") decision issued on August 21, 2014, which is considered the Commissioner's final order. *See*, 42 U.S.C. §§ 405(g), 1383(c)(3). AR 21-29.

## III.   ISSUES FOR JUDICIAL REVIEW

Plaintiff initially applied for DBI and SSI benefits on May 26, 2007. The claims were denied on September 26, 2007 and were not appealed. He went back to work and submitted the instant application for DBI and SSI alleging a disability onset date of May 15, 2012, based on a back injury and carpal tunnel syndrome. AR 257; 272. Plaintiff alleges that the ALJ improperly rejected his testimony by misinterpreting the medical evidence and improperly assessing his activities of daily living. Plaintiff requests that the case be remanded for further proceedings. (Doc. 13, 18-28; Doc. 21, pgs. 3-20). The Commissioner opposes each of these arguments and contends that the ALJ's evaluation of the medical evidence and her credibility determination were proper and are supported by substantial evidence. (Doc. 18, pgs. 6-16).

## IV.   THE MEDICAL RECORD

### A.   Plaintiff's Back and Other Related Impairments

Plaintiff began having low back pain in the 1980's. After receiving physical therapy, Dr. Majid Rahimifar, M.D., performed L5-S1 decompression, discectomy and fusion surgery in August 1993.  AR 349; 568-571. Plaintiff tolerated the procedure well. AR 569. He reported a 60-70% improvement in his extremities as a result of these interventions. AR 350.

---

[2] The parties consented to the jurisdiction of the magistrate judge. (Docs. 6 and 23)
[3] References to the Administrative Record will be designated as "AR," followed by the appropriate page number.

In 2001, Plaintiff was involved in an automobile accident after which he began experiencing pain in his neck. AR 349. From 2007 to 2011, he did not seek treatment for his back. However, he received treatment for various complaints including an abscess infection; left shoulder pain, right foot pain, and left ankle tenosynovitis. AR 479-530. In August 2011, Plaintiff received some physical therapy for cervical/shoulder strain. He was given instruction on proper posture, mechanics, stretching, manual traction, and strengthening exercises. AR 389-390.

On January 16, 2012, Plaintiff appeared at Clinica Sierra Vista for a DMV physical examination. AR 478. At that time, he reported chronic low grade pain. AR 478. However, the medical provider noted a normal examination of Plaintiff's back, extremities, hips, and neurological system. AR 478. In May 2012, Plaintiff sought treatment and completion of disability paperwork at Frazer Mountain Community Health Center for his complaints of carpal tunnel syndrome, knee and ankle pain, low back pain, tingling and numbness, and obesity. AR 301-314.

On May 14, 2012, an x-ray of the lumbar spine indicated grade 1 anterolisthesis of L5 on S1 and severe loss of disc space height at that level. Lumbar vertebral body heights were preserved. AR 474 (duplicate AR 310). A subsequent May 19, 2012 MRI of Plaintiff's lumbar spine revealed post-operative changes at the L5 with possible bilateral spondylolysis at L5 relative to S1 with a 3.8-millimeter disc protrusion resulting in mild canal and moderate to severe bilateral foraminal stenosis. Mild canal and mild to moderate bilateral foraminal stenosis at L3-4 and L4-5 was also noted. AR 308. On June 28, 2012, Dr. Rahimifar interpreted the MRI results. He found that the study confirmed the pre-existing knowledge of Grade I spondylolisthesis, and a practically dissolved disc at L5-S1 with a pseudo disc bulge at L5-S1 with significant mobic changes in the epiphyseal plate. AR 311. He also noted evidence of posterolateral fusion. AR 311. He continued to prescribe Norco and Motrin medication for pain and recommended that Plaintiff wear a soft lumbar corset. AR 311-312. He also ordered bilateral low extremity EMG/nerve conduction studies. AR 312.

A July 2012 x-ray of Plaintiff's lumbar spine indicated an 8 to 9-millimeter anterolisthesis of the L5 on S1 that increased to 10 to 11-millimeter on flexion, and extension with "severe"

degenerative changes at L5-S1 with prominent vertebral spurring. Degenerative changes at the facet points of L4-L5 and L5-S1 with pars defects at L5 were noted. AR 307 (duplicate AR 553).

On August 10, 2012, Dr. Hamid R. Salehi, M.D., reported an abnormal electrodiagnostic study of the lower extremities, noting evidence of chronic lumbar radiculopathy in the left S1 and right L4, L5, and S1 roots, but otherwise normal sensory and motor examinations. There was no evidence of peripheral neuropathy or plexopathy. AR 548-549. On August 24, 2012, Dr. Field reported that on examination, Plaintiff was "sitting fairly comfortably" on the examination table; was in no apparent distress; had full range of motion in the elbow, wrist, and hands; had no apparent weakness; but had decreased sensation in the C6 dermatome on the left. AR 545. He noted subjective complaints of neck pain with bilateral cervical radiculopathy and diagnosed L5-S1 spondylolisthesis with severe degenerative changes and bilateral lumbar radiculopathy. AR 545.

A September 2012 MRI of the cervical spine indicated mild canal stenosis with no definite cord compression and moderate to severe left and mild right foraminal stenosis at C5-6; mild canal stenosis with no cord compression and mild to moderate foraminal stenosis at other levels; and areas of abnormal signal intensity in the right cerebellar hemisphere inferiority suggestive of lacunar infarcts. AR 324. An x-ray of Plaintiff's cervical spine indicated "[v]ery mild degenerative change of the cervical spine." AR 348 (duplicate AR 428, 460).

In October 2012, state agency reviewing physician Dr. N. Shibuya, M.D., reviewed the record evidence and found that Plaintiff could perform light work; stand or walk and sit for six hours each in an eight-hour workday; occasionally climb ramps or stairs and never ladders, ropes, or scaffolds; occasionally stoop, kneel, crouch, and crawl; and was unlimited in pushing, pulling, and balancing. AR 101-102. Dr. Shibuya found that Plaintiff was limited to only occasional overhead work and frequent feeling with the left hand. AR 102-103. He also found that Plaintiff needed to avoid work at unprotected heights, inclined planes, and uneven terrain. AR103.

In October, November, and December 2012, Dr. Rahimifar and Dr. Field extended Plaintiff's temporary total disability status until January 2013. AR 320, 334; 543-544. On

November 15, 2012, Dr. Field reported that on examination, Plaintiff was sitting "fairly comfortably" on the examination table in no apparent distress; had full range of motion in the neck, elbows, wrists, and hands; had slightly decreased grip strength in the left hand of 4+/5; and had some decreased sensation at the left C5 and C8 dermatomes. AR 334. He diagnosed Plaintiff with cervical degenerative disc disease with bilateral cervical radiculopathy. AR 334. He found that Plaintiff was temporarily totally disabled until January 2013. AR 335, 544.

On December 20, 2012, Dr. Rahimifar examined Plaintiff for his neck issues and complaints of face twitching. Dr. Rahimifar noted that Plaintiff was young and continuing to work as a mechanic despite his neck complaints. They discussed a conservative approach to treatment versus doing surgery including cervical traction, wearing a cervical collar, or taking steroids. AR 333.

On January 24, 2013, Dr. Field reported that Plaintiff was temporarily totally disabled for another three months, until April 2013. AR 332. In April 2013, Dr. Field reported that on examination, Plaintiff was alert and oriented times three; his memory problems had resolved; he had hyporeflexia (below normal reflexes) in both upper extremities; was areflexic (absent reflexes) in the lower extremities; had normal motor examination; had decreased sensation in the left L5 and S1 dermatome; and had positive straight leg raising test on the left. AR 331. Dr. Field diagnosed Plaintiff with cervical multilevel degenerative disc disease with bilateral cervical radiculopathy and lumbar degenerative disc disease with bilateral lumbar radiculopathy, and ordered a MRI for the lumbar spine. He instructed Plaintiff to follow-up after the MRI study. AR 331.

On May 20, 2013, state agency reviewing physician Dr. R. Betcher, M.D., reviewed the medical record and affirmed the limitations found by Dr. Shibuya in October 2012. AR 135-137.

On May 24, 2013, a MRI of the lumbar spine indicated minimal disc bulge at L4-L5; marked disc space narrowing with shallow disc bulge at L5-S1 with facet hypertrophy; and disc bulge causing moderate to severe bilateral neural foraminal stenosis. All other levels of Plaintiff's spine showed no significant disc or facet abnormality, spinal stenosis, or foraminal Stenosis. AR 539. On May 31, 2013, Dr. Field reported that on examination, Plaintiff had

absent reflexes in the lower extremities and hyporeflexia in the upper extremities, 5/5 motor examination, and decreased sensation in the L5 and S1 dermatomes. AR 537. Dr. Field referred Plaintiff for consultation for back surgery. AR 537.

On June 12, 2013, x-ray imaging of the lumbar spine indicated 9 to 10 millimeter of anterolisthesis of L5 on S1 with severe disc space height loss. AR 425 (duplicate AR 466). On June 27, 2013, Dr. Rahimifar wrote a letter stating that Plaintiff ultimately needed back surgery for his spondylolysis and spondylolisthesis, but that he was not a good surgical candidate until he lost fifty pounds. AR 535.

On September 9, 2013, Plaintiff complained of left ankle pain. Plaintiff's medical provider reported that on examination, Plaintiff had mild edema and full range of motion in the left ankle. AR 424 (duplicate AR 461). On September 19, 2013, Plaintiff had a negative study for deep vein thrombosis in the left leg. AR 564. Dr. Jerome Vu, M.D., reported that Plaintiff had swelling in the left foot consistent with cellulitis and that it had resolved. The foot was stable upon discharge. AR 558-559.

From November 2013 to March 2014, Plaintiff received epidural injections for his back and neck pain. AR 364-365; 383-384 (December 2013 injection); 366-367; 385 (November 2013 injection). On November 6, 2013, December 5, 2013, January 9, 2014, and March 27, 2014, Dr. Afaq Kazi, M.D., reported that on examination, Plaintiff had normal gait; had mild to moderate muscle tenderness at various levels of the cervical spine; had 5/5 muscle strength and grip strength bilaterally; absent reflexes in the biceps, triceps, and brachioradialis; had decreased sensation to light touch in both upper extremities; had moderate muscle tenderness in the lumbar spine; had 5/5 strength in the lower extremities bilaterally; had some absent reflexes in the knee; had normal sensation; had normal ankle flexion; and had intact cranial nerves; and had normal mental orientation. AR 349; 350 (duplicate AR 369); 353-354 (duplicate AR 372); 356 (duplicate AR 375); 359 (duplicate AR378). During the November and January visits, Plaintiff indicated that because of his pain, he was not able to work, perform household chores, do yard work or shopping, or participate in recreational activities including sex and physical exercise. AR 349; 355.

In January 2014, Plaintiff reported a 50% improvement in back pain after receiving a caudal ESI with catheter in December , as well as other pain medications including Duragesic and Neurontin. AR 355. At that time, he rated his pain at 6/10. AR 355. On March 27, 2014, Plaintiff reported that the Duragesic helped but only lasted 36-40 hours, and that he needed to take Norco for the next 36 hours. AR 358. Plaintiff rated his pain at 5/10. AR 358. At that time, Dr. Kazi instructed Plaintiff to exercise, eat a low-fat diet, and continue medications including Norco, Neurontin, Flexeril, and Duragesic. AR 349-350 (duplicate AR 358-369); 353-354 (duplicate AR 372-373); 356 (duplicate AR 375); 369 (duplicate AR 378)).

While seeking pain management treatment on December 27, 2013, Plaintiff reported to his medical provider that his pain was a "5" on a scale from 1 to 10. He reported that he "feels well" and had no complaints. AR 404 (duplicate AR 440). Plaintiff's physical examination was within normal limits in all areas of functioning. AR 404.

In February 2014, an x-ray imaging of the right shoulder indicated overall normal results of the shoulder. AC joints were normal in width and showed only mild inferolateral sloping of the acromion. AR 400 (duplicate AR 436). In March 2014, a MRI of the right shoulder revealed marked inflammatory response across the AC joint; cuff tendinitis; biceps tendinitis; and glenohumeral capsulitis or sprain. AR 396 (duplicate AR 432). From March to May 2014, Plaintiff underwent physical therapy, as well as muscle stimulation, that resulted in conservative treatment of Plaintiff's right bicep tendinitis. AR 574-584.

On April 3, 2014, Dr. Field reported that Plaintiff had slight edema in the left foot, slow and antalgic gait, decreased sensation, and 4 to 4+/5 motor examination. AR 532. Dr. Field reported that Plaintiff had "marked limitation" in his ability to ambulate, that he did not expect Plaintiff to be able to return to any type of work at that time, and that Plaintiff would most likely be disabled from that point onward. AR 532.

On June 11, 2014, MRI imaging of the cervical spine indicated mild degenerative changes resulting in mild stenosis at various levels, small chronic-appearing disc protrusions, and nonspecific cervical straightening. AR 586-587. On June 12, 2014, Dr. Rahimifar reviewed this MRI and recommended conservative treatment. AR 585. He referred Plaintiff to neurology and

recommended a follow-up appointment with a PA in three months. AR 585. He also recommended phasing out all narcotic medication including Norco and a Fentanyl patch. He suggested that Plaintiff go to a "non-physical work situation with no repetitive bending or twisting." AR 585.

An x-ray performed on August 4, 2014 of Plaintiff's thoracic spine, revealed mild degenerative changes to the thoracic spine and no focal vertebral anomaly. AR 612.

### B. Plaintiff's Carpal Tunnel Syndrome Condition

In March 2007 Plaintiff reported having numbness in his hands for five years. AR 526. An examination revealed 5/5 strength; full range of motion and strength; negative Tinel's signs; but positive Phalen's test. AR 526. He was referred to physical therapy.

On August 2, 2007, Plaintiff saw orthopedic hand surgeon Dr. Matthew Malerich, M.D., who diagnosed Plaintiff with bilateral carpal tunnel syndrome, worse in the left than right, and recommended cortisone injection and decompression surgery. AR 393. On August 16, 2007, Dr. Malerich reported that sensation was returning to the hand.[4] AR 388. The doctor indicated he would schedule surgery, however, there is no indication in the record of whether this surgery occurred. AR 388.

On November 15, 2012, Plaintiff requested a re-evaluation of his EMG/nerve conduction studies for his upper extremities. AR 334. He was complaining of neck pain radiating to his left arm and into his low back which radiated to both lower extremities. AR 334. EMG and nerve conduction studies conducted by Dr. Salehi on November 9, 2012 revealed essentially normal motor and sensory studies; evidence of mild median nerve entrapment at both wrists; no evidence of ulnar nerve entrapment at the elbow; findings consistent with cervical radiculopathy at right C7 and left C5 roots; and no evidence of cervical plexopathy or large fiber peripheral neuropathy. AR 334, 338-339.

After the hearing but before the ALJ issued her decision, on July 14, 2014, an EMG was conducted to evaluate for neuropathy versus cervical radiculopathy. Dr. Saremi Kavech concluded that the "study was abnormal and that the electrophysiologic findings were consistent

---

[4] It is unclear from the treatment notes, which hand the doctor was referring to. AR 388.

8

with moderate right median entrapment neuropathy across wrist, as in carpal tunnel syndrome. AR 603. Changes in the left median nerve were likely attributed to a previous history of carpal tunnel syndrome and /or its surgical correction." There was no evidence for cervical radiculopathy in either upper extremity. AR 603. Although not entirely clear from the record, it appears that this documentation was not submitted to the ALJ before she issued her decision as the Appeals Council indicated this was additional evidence submitted as part of the appeal and marked it as Exhibit 18F. AR 1-6.

## V. PLAINTIFF'S TESTIMONY

Plaintiff was 45 years old at the time of hearing. AR 55. He was 5'10" and weighed 263 pounds. AR 55. He completed high school and some college, and had a driver's license. AR 56. He has a total of six children (three biological and three step-children) ranging in age from 11 to 21. AR 56. Three of the children live with him full time and the other three children either live on their own or spend half of the time with their other biological parent. AR 56-57.

Plaintiff last worked in May 2012. At that time, he worked for four years as a machinist in the aerospace industry. AR 57. While there, he lifted 80 to 100 pounds but left the job due to tingling and numbness in his legs. AR 57. Previously, he was a cabinet builder for six months where he lifted up to 100 to 125 pounds. He left that job because he did not like his boss. AR 58. Prior to the cabinet building job, Plaintiff worked as a cashier at a gas station from December 2006 to December 2007 and lifted 40 to 50 pound boxes. He left that job because the cabinet-making job was better pay. AR 59. In 1999 to 2002, Plaintiff worked as a heavy equipment operator in an oil field, and worked on and off because he was raising his son. AR 59-60. Around 2001, Plaintiff was a tour bus driver for three months where he worked 32 hours a week and lifted up to 40 pounds. AR 60-61. In 1998, Plaintiff did some engineering work which entailed running equipment and laying pipelines. AR 61.Plaintiff has tried to volunteer for Hoffman Hospice for bereavement support since May 2012, however, he was not cleared by a doctor for a medical release. AR 61-62.

Plaintiff is unable to do work of any kind due to pain. AR 63. He sleeps most of the day because he cannot sleep at night. AR 63. When he gets up, he takes pain medications and pain

patches to help him get through the day. AR 63. He cannot walk long distances, sit or stand for a long time, or close either of his hands all the way. His hands tingle and are numb, and sitting at the computer for any amount of time makes his right arm go numb. AR 63. He also has numbness in the legs.AR 63. He naps during the day beginning at about 1:00 until his wife gets home from work, and then he helps her make dinner. AR 63-64. He goes to bed after they eat. His symptoms began getting worse in May 2012. AR 65. Since that time, he can only lift a maximum of eight pounds. AR 68.

Plaintiff had back surgery in about 1992 and needs another surgery because the mass fusions in his spine have failed him. AR 64. He was in an automobile accident in 2001 that caused injury to his cervical spine. AR 64. Plaintiff takes a Fentanyl patch, Norco, Flexeril, and Ibuprofen for his pain. AR 65. The side effects from these drugs make him dizzy, drowsy, groggy, and irritable. AR 65. He has never been hospitalized, but he went to the emergency room two to three times because he thought he was having a heart attack. He also went to the ER one time to treat an infection and swelling in his feet. The doctor told him the infection was caused by the nerve damage in his legs and feet. AR 65-66. Plaintiff's doctor instructed him to lose 50 pounds and he has lost 25 pounds. AR 66. Pain management has helped reduce his pain by about 50 to 60 percent. AR 66-67. He started using a cane about eight or nine months ago to stabilize himself when getting up from sitting and when walking around. Dr. Fields suggested the cane but did not prescribe it. AR 67-68.

Plaintiff was convicted of drug possession in the early 90's and was granted a pardon by the Court of Kern County. AR 62-63. He last used illegal drugs in 2006 after he rededicated his life to Christ in a prison cell. AR 68. He is able to dress and groom himself and prepares the dishes for washing but is unable to actually wash them because he can't close his hands all the way. AR 69. He is also able to do some dinner preparation like chopping lettuce, preparing food in the microwave, and making sandwiches. He waters the plants in the yard and goes shopping two or three times a month. AR 68-70. He is unable to walk much because he lives in the mountains which is hilly, so if he walks, he does so at the grocery store or the park. AR 70.

For fun, he attends church and club meetings and has friends. AR 70. He has traveled to

Pismo Beach and Big Sur "a couple times." AR 70. He can drive or sit in a car for thirty minutes to one hour maximum but has to stop often to get the blood flowing in his legs. AR 71. He is able to drive when he is not too overly medicated. AR 71-72. Plaintiff checks his email on the computer every day for fifteen minutes to an hour at a time and sometimes helps to pay bills online. AR 71-72. He starts the laundry but his daughter finishes because he is training her to do her own laundry. AR 71. He reads the bible every day and also reads other books as his hobby. AR 72. Plaintiff attends special events like a graduation, church picnics, and bible study. AR 72-72.

Plaintiff testified would be unable to perform his prior cashier job because it requires too much standing or sitting on a high stool. It also involves fine motor skills when dealing with money and closing his hands to stock shelves. AR 73. He is unable to do the heavy equipment operator work because it is too rough on his back. AR 73-74. On a good day, he is able to walk around Costco and back to his car in the parking lot. AR 74. On a bad day, he does not go out, or at most, he walks to the local grocery store and walks in two aisles. AR 74. Plaintiff has "bad days" about four to five times a month when his patch wears off. AR 74. He can comfortably stand for ten to fifteen minutes without a cane and for twenty minutes with a cane. AR 74-75. He drives four to five times a month. AR 75. His neck pain was recently exacerbated during physical therapy. AR 76. He has more pain in the right shoulder and left hand. AR 77. He experiences some swelling in his left foot about every two to three months. AR 77-78.

## VI. THE DISABILITY DETERMINATION PROCESS

To qualify for benefits under the Social Security Act, a plaintiff must establish that he or she is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment that has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 1382c(a)(3)(A). An individual shall be considered to have a disability only if:

> . . . his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national

economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.
42 U.S.C. § 1382c(a)(3)(B).

To achieve uniformity in the decision-making process, the Commissioner has established a sequential five-step process for evaluating a claimant's alleged disability. 20 C.F.R. §§ 404.1520(a)-(f), 416.920(a)-(f). The ALJ proceeds through the steps and stops upon reaching a dispositive finding that the claimant is or is not disabled. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The ALJ must consider objective medical evidence and opinion testimony. 20 C.F.R. §§ 404.1527, 404.1529, 416.927, 416.929.

Specifically, the ALJ is required to determine: (1) whether a claimant engaged in substantial gainful activity during the period of alleged disability, (2) whether the claimant had medically-determinable "severe" impairments, (3) whether these impairments meet or are medically equivalent to one of the listed impairments set forth in 20 C.F.R. § 404, Subpart P, Appendix 1, (4) whether the claimant retained the residual functional capacity ("RFC") to perform his past relevant work, and (5) whether the claimant had the ability to perform other jobs existing in significant numbers at the regional and national level. 20 C.F.R. §§ 404.1520(a)-(f), 416.920(a)-(f).

## VII. SUMMARY OF THE ALJ'S FINDINGS

Using the Social Security Administration's five-step sequential evaluation process, the ALJ determined that Plaintiff did not meet the disability standard. AR 21-29. At step one, she found that Plaintiff met the insured status requirements through December 31, 2017, and that he had not engaged in substantial gainful activity since May 15, 2012, the alleged onset date. AR 23. At step two, the ALJ identified degenerative disc disease of the cervical and lumbar spine, and obesity as severe impairments. However, she found that Plaintiff's diabetes. carpal tunnel syndrome, and shoulder pain were non-severe impairments. AR 23-24. At step three, the ALJ determined that the severity of Plaintiff's impairments did not meet or exceed any of the listed impairments. AR 24.

Based on a review of the record, the ALJ determined that Plaintiff had the RFC to perform

12

less than a full range of light work as defined in 20 CFR § 404.1567 (b) and 20 CFR § 416.967 (b). Specifically, the ALJ found Plaintiff could: lift and carry ten pounds frequently and twenty pounds occasionally; stand, walk, and sit for six hours in an eight hour day; occasionally climb but could not climb ladders, ropes, or scaffolds; occasionally kneel, stoop, crouch, and crawl; and perform overhead reaching bilaterally. He could frequently feel with this left, non-dominant hand; and he should avoid concentrated exposure to hazards such as unprotected heights. He should also avoid walking on inclined planes and uneven terrain. AR 24-27. Given these limitations, the ALJ determined that Plaintiff could perform his past work as a clerk and a shuttle driver. AR 28. Alternatively, the ALJ found that Plaintiff could perform work as a machine operator, an abrasive machine operator, and a ticket taker. AR 29.

**VII. STANDARD OF REVIEW**

Under 42 U.S.C. § 405(g), this Court reviews the Commissioner's decision to determine whether: (1) it is supported by substantial evidence; and (2) it applies the correct legal standards. *See Carmickle v. Commissioner*, 533 F.3d 1155, 1159 (9th Cir. 2008); *Hoopai v. Astrue*, 499 F.3d 1071, 1074 (9th Cir. 2007).

"Substantial evidence means more than a scintilla but less than a preponderance." *Thomas v. Barnhart*, 278 F.3d 947, 954 (9th Cir. 2002). It is "relevant evidence which, considering the record as a whole, a reasonable person might accept as adequate to support a conclusion." *Id.* "Where the evidence is susceptible to more than one rational interpretation, one of which supports the ALJ's decision, the ALJ's conclusion must be upheld." *Id.*

**VIII. DISCUSSION**

    **A. The ALJ's Rejection of Plaintiff's Testimony is Not Supported by Substantial Evidence.**

Plaintiff contends that that ALJ's assessment of Plaintiff's credibility is flawed because she did not provide clear and convincing reasons to reject Plaintiff's pain testimony. Specifically, he argues the ALJ misinterpreted the medical records regarding his back impairment, failed to properly assess medical records regarding his carpel tunnel syndrome, improperly exaggerated Plaintiff's activities of daily living, and erroneously concluded that Plaintiff had only engaged in

13

conservative treatment. (Doc. 13, pgs. 18-28; Doc. 21, pgs. 2-20). Defendant argues that Plaintiff fails to prove reversible error with regard to the ALJ's credibility determination. In particular, she contends that the ALJ properly relied on a lack of objective medical evidence to support Plaintiff's testimony, and that his activities of daily living, and conservative treatment support the ALJ's findings. (Doc. 18, pgs. 14-23). A review of the record reveals that the ALJ did not properly evaluate the medical evidence and as a result, the rejection of Plaintiff's pain testimony is not supported by substantial evidence.

### *1. Legal Standard*

A two-step analysis applies at the administrative level when considering a claimant's credibility. *Treichler v. Comm. of Soc. Sec.*, 775 F. 3d 1090, 1098 (9th Cir. 2014). First, the claimant must produce objective medical evidence of his or her impairment that could reasonably be expected to produce some degree of the symptom or pain alleged. *Id*. If the claimant satisfies the first step and there is no evidence of malingering, the ALJ may reject the claimant's testimony regarding the severity of his or her symptoms only if he or she makes specific findings and provides clear and convincing reasons for doing so. *Id*.; *Brown-Hunter v. Colvin*, 806 F.3d 487, 493 (9th Cir. 2015); SSR 96-7p (ALJ's decision "must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and reasons for that weight.").[5] Factors an ALJ may consider include: 1) the

---

[5] Social Security Ruling 96-7p was superseded by Ruling 16-3p, effective March 28, 2016. See 2016 WL 1020935, *1 (March 16, 2016) and 2016 WL 1131509, *1 (March 24, 2016) (correcting SSR 16-3p effective date to read March 28, 2016). Although the second step has previously been termed a credibility determination, recently the Social Security Administration ("SSA") announced that it would no longer assess the "credibility" of an applicant's statements, but would instead focus on determining the "intensity and persistence of [the applicant's] symptoms." See SSR 16-3p, 2016 WL 1020935 at *1 ("We are eliminating the use of the term 'credibility' from our sub-regulatory policy, as our regulations do not use this term. In doing so, we clarify that subjective symptom evaluation is not an examination of an individual's character."). Although Social Security Rulings "do not carry the force of law," they "are binding on all components of the [SSA]" and are entitled to deference if they are "consistent with the Social Security Act and regulations." 20 C.F.R. § 402.35(b)(1); *Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1224 (9th Cir. 2009) (citations and quotation marks omitted).
As the Ninth Circuit recently acknowledged, SSR 16-3p "makes clear what our precedent already required: that assessments of an individual's testimony by an ALJ are designed to 'evaluate the intensity and persistence of symptoms after [the ALJ] find[s] that the individual has a medically determinable impairment(s) that could reasonably be expected to produce those symptoms,' and not to delve into wide-ranging scrutiny of the claimant's character and apparent truthfulness." *Trevizo, v. Berryhill*, 862 F. 3d 987, 995 n.5 (9th Cir. 2017) see also *Cole v. Colvin*, 831 F.3d 411, 412 (7th Cir. 2016). SSR 16-3p became effective after the issuance of the ALJ's decision and the Appeals Council denied review in the instant case. It is unclear whether SSR 16-3 applies retroactively. However, the applicability of SSR 16-3p need not be resolved here since the ALJ's evaluation of Plaintiff's subjective complaints in this case meets the guidelines set forth in both SSR 16-3p and its predecessor, SSR 96-7p.

applicant's reputation for truthfulness, prior inconsistent statements or other inconsistent testimony; (2) inconsistencies either in the claimant's testimony or between the claimant's testimony and her conduct; (3) the claimant's daily activities; (4) the claimant's work record; and (5) testimony from physicians and third parties concerning the nature, severity, and effect of the symptoms of which the claimant complains. *See Thomas*, 278 F. 3d at 958-959; *Light v. Social Security Administration*, 119 F. 3d 789, 792 (9th Cir. 1997), *see also* 20 C.F.R. §§ 404.1529(c), 416.929(c).

Because the ALJ did not find that Plaintiff was malingering, she was required to provide clear and convincing reasons for rejecting Plaintiff's testimony. *Brown-Hunter*, 806 F. 3d at 493; *Smolen*, 80 F.3d at 1283-84; *Lester v. Chater*, 81 F.3d 821, 834 (9th Cir. 1995).[6] When there is evidence of an underlying medical impairment, the ALJ may not discredit the claimant's testimony regarding the severity of his or her symptoms solely because they are unsupported by medical evidence. *Bunnell v. Sullivan*, 947 F.2d 341, 343 (9th Cir. 1991); SSR 96-7. Moreover, general findings are insufficient; rather, the ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints. *Brown-Hunter*, 806 F. 3d at 493.

Plaintiff alleged that he was unable to work due to back pain and carpel tunnel syndrome. AR 55-81. When rejecting Plaintiff's testimony, the ALJ found Plaintiff's obesity and degenerative disc disease of the cervical and lumbar spine were severe impairments, but his carpal tunnel syndrome was not.[7] AR 23-24. As noted above, she devised a RFC of light work with various postural and environmental limitations and limited Plaintiff to only frequently feeling with the left hand. AR 24. She also noted that Plaintiff's treatment had been conservative since the alleged onset date, and that his daily activities were fairly extensive which all undercut his allegations of disabling pain. AR 24-27

Plaintiff contends the ALJ improperly assessed the medical evidence and improperly used this as a basis to reject Plaintiff's pain testimony. In particular, he asserts that the ALJ erroneously found his carpal tunnel syndrome not to be a severe impairment because she ignored a EMG study conducted in July 2014 performed by Dr. Saremi Kavech, which found moderate right median entrapment neuropathy across the wrist which is consistent with carpel tunnel. He

---

[6] Although the Commissioner argues that clear and convincing reasons are not required to reject a claimant's testimony, the Ninth Circuit's legal precedent is clear that this is the required standard in this circuit.

[7] The ALJ also found Plaintiff's diabetes and shoulder pain to be non-severe impairments. AR 23-24.

also opined that changes in the left median nerve were likely attributed to a previous history of carpal tunnel syndrome and/or its surgical correction and that there was no evidence of cervical radiculopathy in either upper extremity.[8] AR 603. Although Plaintiff argues the ALJ erred in this regard, it appears the ALJ did not have this record at the time of her decision. However, the document was submitted to the Appeals Council which found this evidence did not form a basis to change the ALJ's decision. AR 1-6. This Court disagrees. The ALJ found Plaintiff's carpal tunnel syndrome not to be a severe impairment because there was no nerve entrapment consistent with carpal tunnel syndrome. AR 24. This new evidence suggests otherwise. However, there has been no doctor's opinion interpreting how this new evidence may affect Plaintiff's functional limitations, especially in his right hand. This new information may also affect the ALJ's RFC, as well as her credibility determination.

Similarly, when evaluating the medical evidence, the ALJ evaluated the opinions of four doctors including: 1) two non-examining physician reports submitted by Dr. Shibuyu, M.D. on October 2012 (AR 101-103) and Dr. Betcher in May 2013 (AR 135-137), both who opined Plaintiff could perform light work with some limitations; 2) the opinion of Dr. Field (one of Plaintiff's treating physicians) given on April 13, 2014, who opined Plaintiff would not be able to return to any type of work and would be permanently disabled (AR 532); and 3) Dr. Rahimifar (another one of Plaintiff's treating physicians), who after evaluating the most recent MRI of Plaintiff's cervical spine, suggested that Plaintiff go to a "non-physical work situation with no repetitive bending or twisting." AR 585. The ALJ gave weight to Dr. Rahimifar's opinion, as well as to the two non-examining physicians' findings and adopted their limitations when formulating the RFC. However, she discredited Dr. Fields findings because they were inconsistent with the other opinions, were based on Plaintiff's subjective complaints, and because there was no clinical or diagnostic evidence to support a finding of total disability. AR 25-27.

The ALJ's analysis of the medical evidence is problematic for several reasons. Although she relied on Dr. Shibuyu and Dr. Betcher's opinions to formulate the RFC, those assessments were completed before the June 2014 MRI of Plaintiff's cervical spine. AR 101-103; 135-137; 586-587. Also, neither doctor reviewed Plaintiff's most recent lumbar spine MRI which was

---

[8] The Commissioner has not addressed this argument or the new documents in her pleading.

completed on May 23, 2013.[9] Moreover, when assessing the medical evidence, the ALJ found that there was no showing of any further degeneration that would account for Plaintiff's sudden alleged inability to work. AR 25. When doing so, she noted that the most significant lumbar findings remain at L5-S1 (the site of Plaintiff's initial surgery), and there is no evidence of a worsening of that condition since the surgery, despite that fact that Plaintiff subsequently had worked for years. AR 26. A close review of the evidence, however, reveals that the ALJ's interpretation is not entirely accurate. In June 2012, Dr. Rahimifar interpreted the May 2012 MRI of Plaintiff's lumbar spine and concluded that the study confirmed the pre-existing knowledge of Grade I spondylolisthesis, *and a practically dissolved disc at L5-S1, as well as a pseudo disc bulge at L5-S1, with significant mobic changes* in the epiphyseal plate. AR 311. He also noted evidence of posterolateral fusion. AR 311. After reviewing the second MRI of Plaintiff's lumbar spine taken in May 2013, Dr. Rahimifar noted that Plaintiff would need surgery for the spondylolysis and spondylolisthesis, but was not a good candidate until he lost weight. AR 535. Thus, contrary to the ALJ's representations, there was a change in Plaintiff's lumbar since his initial surgery in 1993. The remaining issue, therefore, is to determine whether this change renders Plaintiff completely disabled. The answer to that question is unknown because no doctor has provided a complete assessment of Plaintiff's functional abilities after reviewing all of Plaintiff's most recent test results.

Although the ALJ relied on a 2014 statement made by Dr. Rahimifar to support her findings that Plaintiff could perform light work, the Court is not persuaded that this is a full assessment of Plaintiff's abilities. It is correct that Dr. Rahimifar had suggested that Plaintiff go to a "non-physical work situation with no repetitive bending or twisting." AR 585. However, this recommendation was not a formal evaluation of Plaintiff's functional abilities, rather it was a passing reference made in a doctor's note written after reviewing the 2014 MRI of Plaintiff's cervical spine. There is no indication that this restriction relates to impairments in Plaintiff's lumbar spine which presents different symptomology. Additionally, it is unclear what Dr. Rahimifar meant by a "non-physical work situation." In light of these ambiguities, the Court cannot find that the ALJ's credibility determination is supported by substantial evidence. Similarly, because an assessment of Plaintiff's daily activities and his medical treatment are

---

[9] This was four days after Dr. Betcher's final review of the record. AR 135-137; 539.

inescapably linked to conclusions regarding the medical evidence, the Court is unable to affirm the ALJ's credibility determination on that basis. 20 C.F.R. §§ 404.1529, 416.929.

## IX. REMAND FOR FURTHER ADMINSTRATIVE PROCEEDINGS

The Court must determine whether this action should be remanded to the Commissioner with instructions to immediately award benefits, or whether this action should be remanded to this Commissioner for further administrative proceedings. Remand for further proceedings is appropriate when an evaluation of the record as a whole creates serious doubt as to whether the claimant is in fact disabled. *Garrison v. Colvin*, 759 F. 3d 995, 1021 (9th Cir. 2014). Conversely, a court should remand with for an award of benefits when: (1) the record has been fully developed and further administrative proceedings would serve no useful purpose; (2) the ALJ has failed to provide legally sufficient reasons for rejecting evidence, whether claimant testimony or medical opinion; and (3) if the improperly discredited evidence were credited as true, the ALJ would be required to find the claimant disabled on remand. *Id*. at 1020. Even if all three of these criteria are met, the Court can retain flexibility in determining an appropriate remedy. *Brown-Hunter*, 806 F. 3d at 495.

Here, further development of the medical evidence is necessary before a disability determination can be made. The ALJ should obtain a medical opinion(s) that assess(es) Plaintiff's MRIs of his lumbar and cervical spines, as well as the EMG tests related to his carpal tunnel syndrome and provide a functional assessment of Plaintiff's abilities. AR 308; 324; 539; 548-549; 86-587. Any subsequent decision should discuss what weight is assigned to each physician's opinion, the reasons for making such a determination, and why substantial evidence supports that conclusion. The ALJ should then formulate a RFC that encompasses any limitations and assess Plaintiff's credibility anew.

Importantly, the court expresses no opinion regarding how the evidence should ultimately be weighed, or how any ambiguities or inconsistencies should be resolved. On remand, the ALJ will have an opportunity to further consider these issues, and address the medical evidence and non-medical testimony in context of the record as a whole. The ALJ will also be free to reevaluate her analysis and/or further develop the record with respect to any or all of these additional issues.

///

**X. CONCLUSION**

Based on the foregoing, the Court finds that the ALJ's decision is not supported by substantial evidence and is not based on proper legal standards. Accordingly, this Court GRANTS Plaintiff's appeal against the Commissioner of Social Security. This action is REMANDED to the Commissioner for further administrative proceedings consistent with this opinion. The Clerk of this Court shall enter judgment in favor of Plaintiff, David Keith Meyers, and against Nancy A. Berryhill, Commissioner of Social Security. The Clerk of the Court is directed to close this action.

IT IS SO ORDERED.

Dated: **September 29, 2017**         **/s/ Gary S. Austin**
UNITED STATES MAGISTRATE JUDGE